```
1                    UNITED STATES OF AMERICA
                    EASTERN DISTRICT OF MISSOURI
2                        EASTERN DIVISION

3    ERVIN WALKER, et al.,            )
                                      )
4             Plaintiffs,             )
                                      )
5        vs.                          )  No. 4:17-CV-1229 HEA
                                      )
6    DIRECTORY DISTRIBUTING           )
     ASSOCIATES, INC., et al.,        )
7                                     )
              Defendants.             )
8

9                    TRANSCRIPT OF MOTION HEARING

10            BEFORE THE HONORABLE HENRY A. AUTREY
                    UNITED STATES DISTRICT JUDGE
11
                         January 16, 2019
12

13    APPEARANCES:

14    For Plaintiffs:      Ms. Bonnie L. Clair
                           SUMMERS COMPTON WELLS LLC
15                         8909 Ladue Road
                           St. Louis, MO  63124
16
                           Mr. Russell S. Post
17                         BECK REDDEN, LLP
                           1221 McKinney
18                         Suite 4500
                           Houston, TX  77010
19
                           Mr. Richard W. Mithoff
20                         MITHOFF LAW FIRM
                           500 Dallas Street
21                         Suite 3450
                           Houston, TX  77002
22
      For Defendants:      Mr. David A. Warfield
23                         THOMPSON COBURN, LLP
                           One US Bank Plaza
24                         505 North 7th Street
                           St. Louis, MO  63101
25
```

```
 1    For Defendants        Ms. Julie A. Totten
      via Telephone:        Mr. Marc A. Levinson
 2                          ORRICK, HERRINGTON & SUTCLIFFE LLP
                            400 Capitol Mall
 3                          Suite 3000
                            Sacramento, CA  95814
 4

 5
      REPORTED BY:          SUSAN R. MORAN, RMR, FCRR
 6                          Official Court Reporter
                            111 South 10th Street
 7                          St. Louis, MO  63102
                            (314) 244-7983
 8

 9    Proceedings recorded by mechanical stenography, produced by
      computer-aided transcription.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (The following proceedings were held in open court

2       on January 16, 2019 at 11:04 a.m.:)

3              THE COURT:  Good morning all.  This is the matter of

4       Directory Distributing Associates, Inc., Debtor, Ervin

5       Walker, Donald Walker, Eric Allen, Justin Cooper, Regina

6       Coutee, and Brian Mathis, Plaintiffs, and Directory

7       Distributing Associates, Inc., Richard Price, Steve

8       Washington, Laura Washington --

9              (Lights went out.)

10             THE COURT:  -- Roland E. Schmidt, Sandy Sanders, and

11      AT&T Corporation.

12             Maybe the government didn't pay the bill.

13             MR. WARFIELD:  We were all thinking that, Judge.

14      I'm glad you said that.

15             (There was a brief recess.)

16             THE COURT:  So for counsel, Ms. Totten and

17      Mr. Levinson, I guess I probably didn't know that you had

18      fallen off.  And while you were off I had finished the style

19      of the case.  With Laura Washington Roland Schmidt, Sandy

20      Sanders, AT&T Corporation, and all embodied in Civil Case No.

21      4:17-CV-01229.

22             The matter is now before the Court for purposes of

23      proceeding on a hearing with reference to a Motion to

24      Withdraw Reference.  All parties have had the opportunity to

25      respond and/or reply and file their memoranda in support of

1    their respective positions.

2            The parties are present through counsel.  Some

3    counsel are present in open court, other counsel are present

4    by phone.  I believe Ms. Totten, Julie Totten, is present by

5    phone.  Is that correct?

6            MS. TOTTEN:  Yes, Your Honor, I am here.

7            THE COURT:  And, Mr. Levinson, Marc with a C,

8    Levinson is also present by phone, correct?

9            MR. LEVINSON:  Yes, Your Honor.  Thank you.

10           THE COURT:  All right.  And all other counsel are

11   present in open court.  Is everybody ready to proceed?

12           MR. MITHOFF:  We are, Your Honor.

13           THE COURT:  All right.  Let us proceed.

14           MR. POST:  Good morning, Your Honor.  My name is

15   Russell Post.  I am a member of the plaintiffs' counsel team.

16   Our lead counsel, Richard Mithoff, is with me as well as

17   Bonnie Clair, our bankruptcy counsel.

18           Because there's some discussion in the papers about

19   the passage of time in the case and proceedings in the

20   bankruptcy and, in fact, some implication that the plaintiffs

21   have delayed proceedings, I think it may be useful for us to

22   begin by reminding the Court how we get here.  Because the

23   plaintiffs have been trying to move forward in good faith on

24   this Motion to Withdraw Reference for the two years since

25   this bankruptcy was filed.  And we think today is the day

1    that that issue is ripe for a decision.

2            If I can take a couple of minutes to remind the

3    Court of the history of the case because I know you've seen

4    us only once before.

5            THE COURT:  Please.

6            MR. POST:  This is a Fair Labor Standards Act

7    collective action case.  It was originally filed in Texas

8    state court in 2011.  And there was a conditional

9    certification order.  Approximately 19,000 workers nationwide

10   opted into the litigation.  Directory Distributing

11   Associates, the defendant now who is represented by the

12   trustee for the estate of DDA, was a company that hired

13   delivery workers to deliver telephone books under form

14   contracts that classified them as independent contractors.

15   And the plaintiffs have alleged that they were misclassified,

16   and that, in fact, they were employees subject to the Fair

17   Labor Standards Act.

18           DDA contracted with AT&T and various AT&T entities

19   for the delivery of AT&T telephone books, and because of the

20   degree of control that AT&T exercised in that relationship,

21   the plaintiffs have alleged that AT&T was the joint employer

22   of the plaintiffs and was, therefore, likewise liable under

23   the FLSA.  And so that explains why you have DDA and AT&T as

24   the defendants.

25           Now, after the conditional certification order you

1  had a nationwide collective action pending in Texas state

2  court.  And all of the out-of-state plaintiffs were dismissed

3  from the case pursuant to a Texas venue statute that did not

4  permit the out-of-state plaintiffs to proceed in the

5  litigation.

6          That question was litigated through the Texas

7  appellate courts, and ultimately that decision was upheld.

8  And so what was left in the *Walker* case, the case now before

9  you, were the claims of the Texas plaintiffs who had opted

10  into the *Walker* case.

11          After that appeal was concluded, the plaintiffs

12  filed a new action in the Northern District of California,

13  that is the *Krawczyk* action.  And that action was filed on

14  behalf of all of those workers from all states other than

15  Texas who had elected to participate in *Walker,* but who had

16  been dismissed subject to established tolling principles.

17  And it also alleged claims for a subsequent three-year class

18  period, because with the passage of time, there was now a new

19  period of claims for which liability was actionable.  So the

20  *Krawczyk* case, currently in the Northern District of

21  California, includes the claims of the plaintiffs from the

22  other 49 states and claimants for this second class period.

23          The case before you, the *Walker* case, includes only

24  the Texas claimants who were ultimately remaining in the

25  litigation and were eventually transferred here.

1          What happened after the end of the appeal is that

2     the Texas trial court set an accelerated scheduled to push

3     this case toward trial with a trial date of July 2017.  And

4     we were moving forward with the discovery in preparation for

5     that trial date, and likewise we were moving forward with the

6     preliminary steps in the *Krawczyk* action.  Judge Chhabria in

7     *Krawczyk* was pressing that case very actively.  And we had

8     gone through preliminary briefing motions and had dealt with

9     Rule 12 motions, and we had a schedule to move forward toward

10    conditional certification, summary judgment, decertification,

11    et cetera.

12         At that point in October 2016, DDA filed for

13    bankruptcy here in St. Louis in its home forum.  And after

14    some litigation over the question, a stay was imposed over

15    the two adversary actions against DDA, and the stay was

16    extended to AT&T.

17         The Motion to Withdraw the Reference that the

18    plaintiffs are here on today was filed in the Southern

19    District of Texas when the bankruptcy was originally filed

20    seeking to withdraw the reference from the bankruptcy court.

21    But simultaneously there were competing transfer motions that

22    were brought before the court.  The defendants urged that the

23    *Walker* case be transferred here to St. Louis because of the

24    pendency of the bankruptcy proceeding.  The plaintiffs urged

25    that it be transferred to the Northern District of California

1    to be consolidated with the *Krawczyk* case.

2          Ultimately the judge in Houston did not act on the

3    Motion to Withdraw Reference, sent the *Walker* case to Your

4    Honor for further handling.  And so there was never any

5    resolution of the question about the Motion to Withdraw the

6    Reference.

7          And you may recall that we were before you I think

8    last spring, if I recall correctly, it may even have been a

9    bit longer, when we raised this issue and the parties were

10   ready to proceed on it, but we all recognized that there was

11   a pending transfer motion that had been filed in the *Krawczyk*

12   action.  And the defendants took the position that that

13   should be resolved so you would know exactly what the nature

14   of the case was.  And candidly the plaintiffs agreed that

15   that made sense, and so we told you there was no need at that

16   time for you to engage on the issue.

17         So there was, in fact, litigation over the transfer

18   question, and Judge Chhabria denied the motion to transfer

19   *Krawczyk*.  And he denied it with a ruling that recognized the

20   plaintiffs' position that not only did he have a majority of

21   the potential claimants in his case, but he had already made

22   some progress on mastering the substantive issues in the

23   case.  And our position was that we would ask you to withdraw

24   the reference and would then urge you, having withdrawn the

25   reference, to send the adversary action to Judge Chhabria.

1           And he made a ruling that said there are plausible

2   arguments for the plaintiffs to present to the courts in St.

3   Louis that the case should be transferred to the Northern

4   District of California, and so I'm not going to transfer the

5   *Krawczyk* case at this time, I'll wait to see the developments

6   that come from Judge Autrey or the bankruptcy judge.

7           At that point the trustee asked the parties to stand

8   down in litigation in an effort to try and resolve the case

9   through mediation.  And so the reason that there's been a

10  substantial passage of time is that the parties were

11  collaborating toward a multi-party mediation that involved

12  multiple mediators.  The parties worked together in that

13  respect.  It took quite a while to coordinate schedules,

14  principally the schedules of the mediators.  And we agreed

15  and there was, in fact, ultimately an agreed order

16  memorializing the parties' agreement that there would be no

17  further litigation prosecuted until the mediation was

18  concluded.

19          The mediation took place in August of this year, and

20  the parties were engaged in mediation discussions for two

21  days, but it was unsuccessful.  And so at that point we

22  indicated that it would be our intention to move forward with

23  the Motion to Withdraw the Reference and our position

24  regarding transfer of the adversary litigation.

25          There was discussion between the lawyers about our

1      preparation for coming back before the court to withdraw the

2      reference.   There was I know some dialogue among the lawyers

3      about trying to get that scheduled.

4           Meanwhile the trustee, as the trustee had every

5      right to do, moved forward with developing his own plan of

6      action to propose a liquidation plan.   The plaintiffs were

7      not involved in those discussions; we had no input.   We

8      candidly did not even know it was happening.   And so before

9      we could get a hearing on the Motion to Withdraw Reference,

10     the trustee filed a proposed liquidation plan in the

11     bankruptcy court and began taking steps to move forward on

12     that plan.   And we'll discuss that to some extent today.

13          My point principally to you is that we have not been

14     seeking in any way to delay this matter.   We have maintained

15     all along that the Motion to Withdraw Reference is the first

16     question that has to be decided.   And as I'll argue in a

17     moment on the merits, any suggestion that that plan has

18     developed momentum that should preclude you from acting today

19     I think is legally misguided and I think unfairly allows the

20     trustee to put the cart before the horse.

21          The question before you today is whether the

22     reference should be withdrawn.   We will respectfully suggest

23     must be withdrawn under the bankruptcy statute.   And if the

24     reference must be withdrawn, the whole exercise that the

25     trustee proposes with his liquidation plan is lawless, can

1     never be confirmed, will be a waste of time and capital that

2     needs to be spent more prudently on getting these cases to a

3     resolution.

4               The question is ripe for a decision today.  The

5     plaintiffs have been waiting for two years to get a ruling on

6     the Motion to Withdraw Reference.  And although I recognize

7     that the trustee now suggests he would like you to defer that

8     ruling again, and AT&T enjoins them, that is only deferring

9     the inevitable.  The issue is not going to go away, and we

10    need a decision on it today so we can get this case to a

11    resolution in a legally proper and efficient way, not in a

12    way that's going to end in what we expect to be a dead end

13    that wastes time and capital for everyone.

14              With that overview let me turn to the grounds for

15    withdrawal of the reference.  The motion puts forth both

16    permissive and mandatory grounds for withdrawal.  I want to

17    focus the legal argument on the mandatory withdrawal of the

18    reference because I see no principled legal argument.  And,

19    in fact, to his credit the trustee has not even attempted to

20    make a legal argument against withdrawal of the reference.

21    The test for withdrawal is that if a case requires

22    consideration of federal laws other than bankruptcy laws,

23    withdrawal is mandatory, not discretionary.

24              And the test that the federal courts have developed

25    to apply that mandatory standard over the years is that a

1    case that presents a substantial and material question of

2    federal law triggers the mandatory withdrawal of the

3    reference requirement.

4         Courts have not enforced that language so strictly

5    as to say any consideration of any non-bankruptcy law

6    requires withdrawal, I candidly think there's an open

7    question whether the Supreme Court would insist on a literal

8    interpretation of the statute if the question came before it,

9    but even under the test that the courts have applied, that a

10   substantial material question of federal law is necessary,

11   this case easily meets that standard.

12        This case involves purely claims for damages under

13   the Fair Labor Standards Act.  It has no bankruptcy

14   connection whatsoever except for the fact that the Defendant

15   DDA is now a debtor in bankruptcy.

16        The original briefing before the Court when the

17   motion was originally filed pointed out there are a number of

18   complicated matters of liability under the FLSA that will

19   have to be adjudicated in the case.  The question of

20   misclassification, the question of joint employer status,

21   questions regarding remedies.  The defendants took the

22   position that none of those was a substantial and material

23   question of federal law as to which there was any difficult

24   issue to be resolved.  We disagree.  I think that on that

25   standard alone it was obvious that withdrawal was going to be

1     mandatory.

2         But the course of the litigation has revealed two

3     questions about remedies that are unique to the Fair Labor

4     Standards Act as to which there is a significant disagreement

5     between the parties and, candidly, it's all that stands

6     between these parties in my view at this point is coming to a

7     resolution about the remedies available to the class members.

8         And there are two issues that I'll call to your

9     attention.  The first issue is whether the FLSA allows what

10    is known as an overtime gap time claim.  This is a claim for

11    recovery of damages for hours less than the overtime

12    threshold of 40 hours a week but greater than the amount of

13    time for which the plaintiffs were, in fact, paid by the

14    defendants.  The plaintiffs' position is that we are entitled

15    to those damages.  The defendants' position is that we are

16    not entitled to those damages.

17        The plaintiffs' position rests on a Department of

18    Labor bulletin, 29 CFR Section 778.315.  The defendants are

19    citing legal authorities that they say disregard that

20    bulletin.  There is candidly a division in authority among

21    the courts about whether to defer to that bulletin.  That is

22    a significant legal dispute, solely a question of FLSA law

23    that only a district court can resolve.

24        The second issue that bears on the remedies is

25    whether calculation of the plaintiffs' regular rate of pay,

1    which is the key variable for determining overtime

2    compensation in an FLSA case, requires the Court to look at

3    the total number of hours that the plaintiffs worked or only

4    the hours for which they were directly compensated by the

5    defendant when you do the math to determine the regular rate

6    of pay.  So in an FLSA case you look at what the compensation

7    was that was actually paid to the plaintiffs, and then you do

8    a calculation that takes into account the hours that were

9    worked and the hours that were intended to be compensated

10   under the agreement between the parties.

11         The defendants' position is that in order to

12   determine that regular rate, and you can easily see the

13   regular rate dictates what the overtime rate is going to be

14   at time and a half, to determine that regular rate you have

15   to divide compensation by the total number of hours worked

16   including hours that were not reported and for which the

17   plaintiffs were not actually compensated.

18         The plaintiffs' position is that in order to

19   determine the regular rate you divide the compensation by the

20   hours that they were directed to report to their employer,

21   and you do not dilute the regular rate by accounting for the

22   unreported hours for which they were not paid in violation of

23   the FLSA.

24         There is a dispute between the parties about whether

25   that calculation is correct.  The plaintiffs stand on 29 CFR

1      Section 778.318(b).  And there is a disagreement between

2      these parties about how you make that regular rate

3      calculation.

4              Those two hotly contested questions of federal labor

5      law are the critical questions that are going to need to be

6      decided to determine the remedies in this case.  Those are

7      questions that only an Article III court can decide.  They

8      are substantial and material questions that must be resolved

9      in order for this case to be resolved.  And under the

10     language of 28 U.S.C. 157(d), that makes withdrawal of the

11     reference mandatory.  So I'm not even going to talk about the

12     permissive withdrawal criteria because it's not necessary for

13     the Court even to reach it.

14              I do want to speak to the response that you have

15     received from the trustee so I can offer the plaintiffs'

16     perspective on the trustee's position.  The trustee, of

17     course, did not even respond to this motion for two years.

18     And even today he claims he doesn't take a position on the

19     motion.  I will suggest to the Court that's because the

20     trustee's counsel, who is an accomplished bankruptcy attorney

21     who we have great respect for, recognizes that at the end of

22     the day to adjudicate these FLSA claims, withdrawal of the

23     reference is inescapable as a legal conclusion.

24              The trustee's position is that you should yet again

25     defer ruling on the issue in order to avoid the question

1    because he believes he can go forward with a liquidation plan

2    that will somehow estimate these claims that a bankruptcy

3    court cannot adjudicate and lead to a liquidation plan that

4    will assign value to the plaintiffs' claims without any

5    Article III court ever passing on them.  And we respectfully

6    submit that's squarely in the face of the restrictions on

7    bankruptcy court jurisdiction, that in a non-core proceeding

8    such as this one that is going to involve disputed questions

9    that require trial by jury under the Seventh Amendment, the

10   trustee cannot proceed as he has suggested.

11            And I think that this is very much the lesson of

12   *Stern v. Marshall* when the Supreme Court emphasized questions

13   that require adjudication of traditional damage claims are

14   classically the questions that are assigned to the federal

15   judiciary, and Article III requires that they be adjudicated

16   by a federal district court.  They cannot be delegated to the

17   bankruptcy court.  But that is the proposal that the trustee

18   is asking the Court to endorse.  Sooner or later this

19   question will have to be resolved.  If it's resolved today,

20   we avoid a waste of resources pursuing a plan that could

21   never legally be defended.  Otherwise we kick the can down

22   the road, we spend more time and more capital on litigating

23   over a bankruptcy plan that can never survive, and then we

24   come back to you and we have to have the same debate again.

25            The plaintiffs have a path forward.  It's the path

1    forward that we've suggested from the very beginning.  We do

2    not want to delay the resolution of this case, on the

3    contrary we want to move it expeditiously forward.  And here

4    is the path that we propose:

5          No. 1, the Court withdraws the reference, so it's

6    clear to all that these FLSA claims have to be adjudicated by

7    an Article III court.

8          No. 2, we suggest that *Walker* be transferred to the

9    Northern District of California where Judge Chhabria has the

10   claimants from the other 49 states and the second class

11   period and has already spent time investing in the merits of

12   the case.  But obviously if Your Honor thinks it's better

13   that you retain jurisdiction over the *Walker* case, we're

14   certainly happy to proceed here as well.  But either way it

15   has to be adjudicated in an Article III court.

16         No. 3, once that determination is made as to where

17   the case proceeds, we adjudicate the FLSA claims properly in

18   a court with jurisdiction to decide them, and then once the

19   value of that claim is liquidated and determined, that claim

20   becomes a claim to be submitted as part of the bankruptcy

21   plan that can be appropriately confirmed.

22         To the extent the plaintiffs prevail on their theory

23   and we establish that we have damages in the range that we

24   believe we have, which is candidly substantially in excess of

25   the bankruptcy estate, there are avoidance claims for

1    avoidable transfers that the trustee has reserved that would

2    be ripe to be litigated.  There is more than $10 million of

3    avoidable transfer claims that we believe are properly

4    considered to be assets of the estate.

5         The trustee's liquidation plan only gets a small

6    fraction of value for those claims, but that's because it's

7    putting the cart before the horse.  If you adjudicate the

8    FLSA claims, then you know the value of the liability and

9    then those transfer claims can be litigated.

10        Now, let me talk to you a minute about what's going

11   on in the bankruptcy itself.  There are no meaningful

12   creditors of DDA except the FLSA class and AT&T, which has

13   asserted a disputed indemnity claim against DDA.  The other

14   creditors are pennies on the dollar for this estate.

15        So our suggestion that we adjudicate the FLSA claim

16   correctly in an Article III court does no harm to anyone

17   else.  The bankruptcy proceeding can simply be abated as it

18   was for the better part of the last year while we pursued the

19   mediation.  We resolve the value of the FLSA claims and then

20   we go back to the bankruptcy proceeding.

21        And so that then leaves you with the question, what

22   is the value of the liquidation plan that the trustee is

23   asking you to prefer rather than withdrawing the reference

24   and litigating the claims.

25        There are four serious defects with the trustee's

1    proposal to hide from the Motion to Withdraw a Reference and

2    move forward with the plan.  No. 1, as I've said, it would

3    deprive these plaintiffs of their right to an Article III

4    court and a jury under the Seventh Amendment to adjudicate

5    their claims.

6          That is a fatal defect that will make the estimation

7    procedure impossible to confer.  And I would point the Court

8    just in the spirit of a couple of authorities to the *In re*

9    *National Gypsum* case which is cited in the papers.  That's a

10   case in which the federal court recognized that because there

11   were damage claims arising under federal statutes, withdrawal

12   of the reference was mandatory.  And also the *In re Ozier*

13   case, which is cited in the papers in which the federal

14   district court recognized that you cannot adjudicate a

15   non-core claim that will require trial by jury under the

16   Seventh Amendment in a bankruptcy proceeding because it would

17   violate the reexamination clause.  And, therefore, any

18   suggestion that you go forward with this plan is legally

19   misguided.

20         But there are practical problems as well.  The first

21   is that it would make the class ultimately accept the

22   trustee's unilateral determination of the value of the claim.

23   He's assessed a value of $4.9 million for this claim as a

24   whole.  And his proposal to the bankruptcy court is that we

25   will just have to accept that value that he's unilaterally

1    determined subject to his estimation proceeding in which we

2    will have some opportunity to contest that value.  But we've

3    had no input on that claim.  That valuation substantially

4    understates the plaintiffs' valuation of the claim, which as

5    I've explained turns on the resolution in large part of these

6    open questions of FLSA remedies law.

7            No. 2, his plan would allow DDA's owners, the Runk

8    family, to retain the majority of the more than $10 million

9    that they fraudulently took out of the bankruptcy estate as

10   opposed to adjudicating the claim and knowing exactly how

11   much of that avoidable transfer should be on the table in the

12   bankruptcy.

13           No. 3, in a step that I consider truly

14   extraordinary, the plan proposes to give a release to AT&T, a

15   non-debtor defendant of the claims asserted by the

16   plaintiffs' creditors of the bankruptcy estate for $250,000

17   of value to the class.  It's inconceivable that a bankruptcy

18   court can order a release of a non-debtor of viable claims

19   entitled to adjudication in an Article III court with a jury

20   trial under the Seventh Amendment, but that's what the

21   trustee's proposal suggests.

22           He will argue that you should stand down because the

23   plan is already moving forward and there is some reliance

24   interest in moving forward with this procedure.  I suggest

25   that there is neither substantial nor justifiable reliance

```
 1    here.
 2            First, this reliance cannot be justified.  Reliance
 3    on a liquidation plan that as I've explained is lawless and
 4    could not be confirmed and violates Article III could never
 5    be a basis for the Court to defer to this process that was
 6    set in motion.
 7            But, second, the reliance is not substantial.  As I
 8    said, it only was initiated just before Thanksgiving when the
 9    trustee filed his liquidation plan.  I won't suggest that it
10    was in order to get ahead of the plaintiffs on the Motion to
11    Withdraw the Reference, but I will suggest that the trustee
12    knew we were coming back to you for a ruling on the Motion to
13    Withdraw the Reference.
14            All that has happened to this point is the
15    bankruptcy court has approved certain notice procedures to
16    allow notice to be sent to potential claimants that this
17    bankruptcy process is beginning.  There is a hearing set for
18    February 7th to hear objections to this proceeding.  And so
19    if the Court stops this exercise in its tracks today by
20    withdrawing the reference, there is no substantial reliance
21    that we'll be defeated and you will put the case back on
22    track to an orderly and legal resolution.
23            And so I would urge the Court, do not defer to a
24    liquidation plan that was designed to divest the Court of its
25    Article III authority and would deprive us of the right to a
```

```
 1    decision on these claims by an Article III judge and by a

 2    jury.

 3               If the Court has any questions I'm happy to address

 4    them, otherwise I will defer to counsel.  Thank you, Your

 5    Honor.

 6               THE COURT:  Thank you.  Response.

 7               MR. LEVINSON:  This is Marc Levinson, and I guess I

 8    could go now in opposition to the motion or the trustee could

 9    go.  Does counsel for the trustee or the Court have a

10    preference?

11               THE COURT:  Does the trustee have a preference?

12               MR. WARFIELD:  I don't have a preference, Judge, we

13    could do it either way.

14               MR. LEVINSON:  Well, fine, I'll go.  But first thank

15    you for permitting --

16               MR. WARFIELD:  Marc, why don't I go?  I think the

17    Judge would prefer if the trustee goes first.

18               MR. LEVINSON:  Oh, that's fine, Your Honor.  Thank

19    you.

20               THE COURT:  Thank you.

21               MR. WARFIELD:  Your Honor, for the record David

22    Warfield on behalf of John Vaclavek, who is the Chapter 11

23    trustee.  He was appointed in February of 2017, so a lot of

24    this history that Mr. Post went through occurred prior to the

25    trustee's tenure.
```

1          But Mr. Post is correct, we do -- in one respect.

2     We do believe that this Court should defer ruling on the

3     Motion to Withdrawal Reference, in large part because of the

4     events occurring in the bankruptcy court, and they are

5     occurring in very short order.

6          The trustee filed the Chapter 11 plan in November.

7     The plan says that all the FLSA claimants will be paid the

8     full amount of the claims as estimated by the bankruptcy

9     court to be confirmed by the bankruptcy -- or as estimated by

10    the bankruptcy trustee to be confirmed by the Court.

11         The payments would be made under the bankruptcy

12    plan, both the *Walker* plaintiffs and the *Krawczyk* plaintiffs.

13    The payments would be made regardless of whether the

14    individual claimants opted in or not.  But the plaintiffs

15    have objected.

16         The trustee filed the plan and the related pleadings

17    on November 19.  The plaintiffs objected immediately.  We had

18    two contested hearings in the bankruptcy court.  The

19    plaintiffs didn't even want the claimants to know that the

20    trustee had made a proposal that would pay them.  At the two

21    contested hearings -- after the two contested hearings the

22    bankruptcy judge decided that the plan process can go

23    forward, that there will be a hearing, really the first

24    substantive step on confirmation of the plan, on February 7.

25         And we think that should play itself out candidly.

1    And that's a much more comprehensive solution to this issue

2    that the trustee faces, is both really a litigant and an

3    administrator here if you think about it, trying to solve the

4    problems of all the claimants that have been asserted

5    against -- all the claims that have been asserted against the

6    estate.

7            In reliance on the bankruptcy judge's order notices

8    have been sent to over 40,000 potential claimants.  A website

9    has been developed.  Pleadings have been uploaded.  That

10   website is getting a great deal of use because it does

11   provide for some feedback from the claimants.  And they have

12   been filing their responses to the various pleadings in the

13   bankruptcy court.  I know we got about 15 of them yesterday.

14   And there have been a few dozen that have been filed today.

15   So that process is very much underway.

16           Now, a brief summary of the plan, if I can fill in

17   some of the gaps in what Mr. Post described.  The trustee

18   developed this plan sort of from the number and worked

19   backwards.  The trustee has at his disposal a list of all of

20   the workers who delivered telephone books and who fit into

21   the time frames of the relevant two FLSA claims.  The trustee

22   looked at that information.  Working with consultants who are

23   expert in calculating the time worked and the damages

24   incurred with input from the lawyers, we came up with a

25   number that we believe the claimants are entitled to that

1    gives them every benefit of the doubt on the applicable law

2    and the facts.  And, in fact, uses some off-the-clock

3    calculations that the plaintiffs have mentioned in the course

4    of various discussions.

5         This is the trustee's best estimate of what the

6    claimants would receive if they prevailed on 100 percent of

7    their arguments at trial.  Now, we heard that there are two

8    issues.  That's probably the most fulsome description of the

9    two issues I've yet heard from the plaintiffs.  It may help

10   in going back and evaluating our numbers.  But this was the

11   trustee's best faith, good faith estimate as to what these

12   folks would be entitled to.

13        Then the trustee went to the two parties who are --

14   who could contribute to payment of those folks.  Those two

15   parties being AT&T, the codefendant, and the Runk family, the

16   shareholders.  Mr. Post is correct in saying there are

17   transfers slightly in excess of $10 million that appear to be

18   avoidable by the trustee.

19        And we said, will you cover, will you contribute to

20   the plan an amount to pay the trustee's best estimate of what

21   these folks would be due if the case went to trial?  And

22   after considerable discussion that frankly began on the

23   second day of the mediation when it became clear in our

24   interactions with the plaintiff that there wasn't going to be

25   a settlement, we started even before we left the mediation

1    room trying to put together this plan.

2           And we ultimately reached the point where those two

3    plan funders, if you will, agreed to contribute enough money

4    to make a payment to the FLSA claimants of everything that

5    the trustee believes that they are owed.

6           Now, under this FLSA statute counsel is also

7    entitled to a statutory fee.  So we included in the plan a

8    payment of $1.5 million to FLSA counsel and reimbursement of

9    actual expenses.  We didn't think we had to put a cap on that

10   because we didn't know what it would be, so that's an

11   additional $400,000.  So that's what the plan says.

12          By the way, we heard a lot about how we settled for

13   just a fraction of what the Runks owed.  As it works out, the

14   Runks, the shareholders who received the transfers, are

15   paying almost 50 percent of what we would recover from them

16   without any resulting claim or any complications or any

17   litigation or any threat of an adverse result.  So it's not I

18   think exactly accurate to say that we let them off with a

19   nominal payment.

20          Now, the plan also does provide the third-party

21   releases that Mr. Post mentioned.  But he failed to inform

22   the Court that in addition to the payment that AT&T is making

23   to fund the plan, it is also going to waive a claim that it

24   has told the trustee -- "waive" is the wrong word, I'll get

25   back to that.  Has agreed to subordinate its claim of $2.5

1    million effectively until all of the FLSA claimants are paid

2    in full.  It's not technically a waiver, but they've agree

3    they are not going to get paid anything on their claim until

4    every one of the FLSA claimants is paid in full.

5            So we heard about the estimation.  And, Your Honor,

6    I don't know how much you may have run across this

7    previously, but there is a section of the bankruptcy code,

8    it's Section 502(c)(1) of the bankruptcy code, that

9    specifically says a bankruptcy court can estimate the amount

10   of claims that are contingent or unliquidated if the fixing

11   of those claims or setting of those claims would unduly delay

12   the administration of the bankruptcy estate.  This is a

13   provision that was frequently used in bankruptcy when the

14   court is faced with claims that would take a long time to

15   ripen.  Bankruptcy estates can't stay open forever.  So you

16   see this sort of provision used in many different contexts.

17   For example, environmental claims where it may take forever

18   or many decades even for the claim to actually finally be

19   liquidated.

20           Now, "estimation" is the phrase the bankruptcy court

21   uses, but for purposes of our case and generally speaking, it

22   is the allowance of the claim at that amount.

23           Now, any suggestion that the plaintiffs would be

24   deprived of any due process rights going forward just simply

25   isn't true.  The plan is on file.  It's been on file now for

1    two or so months.  The motion to estimate was filed in late

2    November as well.  It's been on file for a couple of months.

3    The plaintiffs have had notice of the February 7 hearing now

4    for some time.  They can appear at that hearing, and I'm sure

5    they will.  And they will argue that the motion to estimate

6    is not well taken, that the trustee has not satisfied the

7    statutory burden of showing undue delay to administration of

8    the estate, and/or they will argue -- clearly they will argue

9    based on what they said this morning that these are claims

10   that are not estimateable under federal law.  They'll have

11   that chance on February 7, three weeks or less from now.

12        Now, if they win that argument, we have said in

13   papers both here and in the bankruptcy court that that will

14   cause the trustee to withdraw the plan.  The plan that is on

15   file is based on the bankruptcy court exercising its

16   authority to estimate the claims.  So it's possible we could

17   know as soon as February 7 that the plan isn't going forward.

18   They'll have ample opportunity to object.

19        But the way we set up this motion, even if the

20   plaintiffs don't prevail on February 7th, even if the

21   bankruptcy court says, yes, I believe you have satisfied the

22   statutory requirements for 502(c)(1) to estimate a claim and,

23   yes, I don't see any exception for FLSA claims in the

24   statute, there is no reason to believe that they alone among

25   all the other claims that can be estimated can't be

1    estimated.  If the trustee prevails on those issues, it still

2    doesn't fix the amount of the claims.  That will be

3    determined at a subsequent hearing.

4         And obviously the plaintiffs will have a second bite

5    at that apple to say, okay, Judge, we've lost on the issue of

6    whether the claims can be estimated, but we think the trustee

7    undershot the estimate.  They'll have the ability to make

8    that argument at a later date.  We haven't fixed the hearing

9    date with the bankruptcy judge yet, but I would offer that

10   that will occur in the first half of 2019.  I feel fairly

11   comfortable with that.  That's about the time frame that we

12   were discussing generally with the bankruptcy judge at those

13   contested hearings.

14        And then finally let's say that they even don't like

15   the number that the judge estimates their claims at.  They

16   can still argue at that point that the plan doesn't meet the

17   standards for confirmation of a bankruptcy plan under the

18   bankruptcy code.  So they will have at least three bites at

19   the due process apple.

20        And all of this will occur on a time frame that

21   seems positively speedy compared to the way the

22   non-bankruptcy litigation has gone in these cases from the

23   beginning, long before the bankruptcy case was even filed.

24        Now, Judge, a word or two about jury trials and

25   bankruptcy because I think this notion that the plaintiffs

1   would have you believe that they can just because of the

2   nature of their claims opt out of the bankruptcy case and not

3   participate in it in liquidating the amounts of their claim

4   is just wrong, and at best is very simplistic.

5            In a given year there are about a million bankruptcy

6   cases filed in the United States up or down 10, 15 percent.

7   And I would venture to say that every single one of those

8   bankruptcy cases has a creditor who is entitled to a jury

9   trial right.  There's a breach of contract, there's a

10  statutory claim that has a right to trial by jury.  But those

11  claims are dealt with in the bankruptcy cases every day in

12  thousands and hundreds of thousands of cases over the course

13  of a year.

14           And that's because notwithstanding what you were

15  told this morning, the allowance or disallowance of claims

16  against the bankruptcy estate is, in fact, a core proceeding.

17  It is a core proceeding under Section 157(b)(2).

18           Now, as to the specific right to jury trials, here's

19  what I can tell you.  There's a statute on that.  28 U.S.C.

20  Section 1411 says that a bankruptcy filing doesn't affect the

21  right to a trial by jury, quote, with regard to a personal

22  injury or for wrongful death tort claim, closed quote.  Those

23  are the two carve-outs.  It doesn't say FLSA.  It doesn't say

24  any other federal statute.  Personal injury and wrongful

25  death claims, those are the claims in which there is

1    statutory authority that says no matter what else happens,

2    that kind of creditor, that kind of claimant is entitled to a

3    jury trial.  There is no such protection, no matter how much

4    the plaintiffs want to portray it that way, for a jury --

5    absolute jury trial right when they choose to assert a claim

6    against the bankruptcy estate.

7            And by the way, I don't necessarily want to get into

8    it, but there is a considerable body of law that says when a

9    creditor participates in a fulsome way in a bankruptcy case

10   regardless of whether they file a proof of claim or not, that

11   they have waived their right to a trial by jury.  And I think

12   if we ever get to that point, that argument will be advanced

13   by the trustee.

14           Also, Your Honor, I'd like to draw your attention to

15   a case decided in this district on this very issue of

16   mandatory withdrawal with a reference, which the plaintiff

17   relies on this morning.  In a case in the 1990s involving the

18   *Interco* bankruptcy case, and Your Honor may remember that,

19   that was a huge case.  The old shoe companies and furniture

20   companies, it was the largest case ever filed in this

21   district for many, many years in a case called *Wittes v.*

22   *Interco.*  Judge Gunn -- well, the claim was a claim under the

23   ADAA, a discrimination and employment act case.  The claimant

24   said, well, that's a special kind of claim, you have to

25   withdraw the reference, the bankruptcy can't decide that

1    claim.  And Judge Gunn said, nope, withdraw the reference

2    doesn't apply to those kinds of claims.  And automatically, I

3    don't care if you have a jury right, and the bankruptcy court

4    was able to adjudicate that claim.  That case if Your Honor

5    or your staff wants to look at is 137 BR 328.  137 BR 328,

6    decided in 1992 by Judge Gunn.

7         So what would happen if the plaintiffs got what they

8    want?  What would happen as a practical matter if the

9    reference was withdrawn?  Well, there is an automatic stay in

10   place against claims against DDA.  That stay was not imposed

11   after any litigation as counsel implied -- I think

12   unintentionally applied.  That stay is automatic.  So the DDA

13   stay is in place.  The bankruptcy judge did extend the stay

14   after some litigation to the codefendants, including AT&T.

15   But regardless, if Your Honor withdrew the reference today,

16   the automatic stay would still be in place.

17        So the plaintiffs would have to go back to the

18   bankruptcy court, file a motion to -- for relief from the

19   automatic stay, and the bankruptcy judge would have to decide

20   that issue.  Now, I think so long as the plan process is

21   proceeding, and there is a resolution in the next few months

22   in sight, I find it very difficult to believe that the

23   bankruptcy judge would grant that relief.  So withdrawal of

24   the reference probably wouldn't as a practical matter

25   accomplish a whole lot in this case.

1            And even if somehow they got relief from the stay,

2      and counsel acknowledged this morning, their first act will

3      not be to rev up the discovery, move toward a litigated

4      resolution of this matter in *Walker*, but it instead would be

5      to file a motion to transfer the venue to the Northern

6      District of California.  And that's despite the fact that

7      this case was pending for five years, I believe, before the

8      case in San Francisco was ever filed.  And it's despite the

9      fact that plaintiffs have already tried to transfer this case

10     one time to the Northern District of California back when it

11     was still in Texas and lost.  So they are going to relitigate

12     that issue instead of moving forward to a conclusion.

13            Now, Your Honor, just a couple responses directly to

14     the four alleged serious defects in the trustee's plan.

15            No. 1, plaintiffs allege that it would deprive them

16     of the right to have this matter litigated by an Article III

17     court and a jury trial, and I think I've responded to that.

18     The fact of the matter is parties who wish to assert a claim

19     against the bankruptcy estate or to share in the race for the

20     estate's assets have a choice, if they want to share in those

21     assets, they have to deal with the bankruptcy court.  If

22     they -- if the plaintiffs here wanted to dismiss with

23     prejudice the estate and pursue AT&T, it could do that and it

24     would be free of the bankruptcy.  Wouldn't necessarily solve

25     my problem because I would still have AT&T's indemnity claim.

1          But the fact of the matter is they want their cake

2     and eat it too.  They want to share in that race of the

3     bankruptcy estate, and with that choice comes consequences,

4     including their, as they see, sacrosanct right to have the

5     matter determined by an Article III judge.

6          They also said that all owners, the shareholders are

7     paying only a fraction of what they took out of the company

8     via fraudulent transfer.  I will represent to the Court that

9     they are paying between 40 and 50 percent on an absolute

10    basis of what they -- the outside limit of their liability

11    pursuant to this plan without any litigation.

12         By the way, another issue that's very important for

13    me and my client as administrators of this estate is we have

14    to bring that claim against the shareholders by December 31

15    of this year.  The statute of limitations has actually

16    already expired for us to bring that claim.  In trying to

17    move this forward to a consensual resolution, we persuaded

18    the shareholders to give us a tolling agreement.  I have no

19    reason to believe that they would give us another tolling

20    agreement.  So that's another reason we need to go forward in

21    the bankruptcy court and see if this will work.

22         It's clear that we won't be able to resolve this

23    case, unshackle the plaintiffs, and go back to just

24    litigating particularly since the first litigation will be

25    where this case should pend.

1          And, finally, the other fatal defect in my notes is

2     that we gave –– the plan gives a release to the non-debtor

3     parties including the Runks, the shareholders, and AT&T.  And

4     in particular that AT&T is only contributing $250,000.  I can

5     represent to your court that the trustee took no role in the

6     allocation of the payments between the Runks and AT&T.  We

7     told them how much money we needed, and they came up with how

8     to divide it among themselves.

9          But be that as it may, in addition to payment of the

10    $250,000, AT&T is, as I said before, subordinating

11    effectively its indemnity claim, which would exist whether

12    there is a judgment entered against AT&T or not because the

13    indemnity purports to include attorneys' fees.  So I have to

14    deal with that claim.  It may be objectionable, it may not be

15    objectionable, but it's a claim that if there is no

16    settlement we have to deal with.  But this settlement under

17    the plan deals with that.  And the provision of third-party

18    releases to parties who fund a plan is de rigueur, it's

19    common.  Strike that, let's use the word common.

20         And by an example I'll give a case that Your Honor,

21    local case Your Honor may be familiar with because it got a

22    fair amount of press coverage at the time, it was the *US*

23    *Fidelis* case a few years ago where there was a fraud

24    committed by the debtor in that case against several hundred

25    thousand parties who purchased aftermarket warranties, and

1    vehicle service contracts to be precise.  And various parties

2    contributed to that plan that then paid out those folks, all

3    of whom I'm sure had a jury trial right incidentally for

4    fraud.  And the plan gave a release to those parties who

5    funded the plan and the payments.  So there's nothing unusual

6    to that -- about that.  It is litigated in bankruptcy court.

7    Cases are confirmed all the time that contain third-party

8    releases.  Sometimes they are not confirmed.  But that's what

9    we'll find out in the bankruptcy court.

10           So in summary, Judge, we've given a lot of thought

11   to this, the trustee and I.  We've put together a program

12   that we think will get money in people's hands soon, within

13   the next six months if we can go forward.  Withdrawing the

14   reference, opening the door to venue litigation, opening the

15   door to motions for relief from stay would not be in our view

16   consistent with this notion of seeing if the bankruptcy

17   process can provide a solution for all the creditors in this

18   case.

19           So, Your Honor, in summary we propose to file a

20   pleading, I think I said before February 9th or 10th in our

21   papers, to let Your Honor know what happens in bankruptcy

22   court on the 7th.  The judge may rule, the judge may take it

23   under advisement.  Either way we'll let you know.  Your

24   Honor, I'm sure, may want to schedule a status conference

25   thereafter.  We think that's fine.  We can take stock where

1    we are then.  I will tell you if we're -- if the judge has

2    approved the motion, the first stage of the motion to

3    estimate, has approved the disclosure statement, we're

4    probably going to say please stand down, let the plan process

5    play out.  But we're happy to come back in a month or so

6    after the bankruptcy court has had a chance to rule and take

7    stock where we are then.

8              Thank you, Judge.

9              THE COURT:  Thank you.  Mr. Levinson.

10             MR. LEVINSON:  Thank you, Your Honor.  Mr. Post and

11   Mr. Warfield have argued at length, so let me just hit a few

12   high points, starting by saying that I support the trustee's

13   position on the case.

14             Let's start with the facts as stated by Mr. Post,

15   almost all of which were accurate and we endorse.  We do

16   disagree, though, with a couple things.  First off, the

17   *Walker* case was set for trial the following July, but the

18   defendants had -- the defendant intended to file a motion to

19   decertify the collective and was in the process of conducting

20   discovery to do so, and then the bankruptcy interceded much

21   to everyone's surprise while they were taking depositions in

22   Houston.  So that stopped, of course.  And the motion to

23   decertify was never filed.  That would have delayed the trial

24   no matter what.

25             If the Court were to withdraw the reference and

1    Judge Surratt-States were to grant relief from the automatic

2    stay, that would proceed.  So we're not talking about a quick

3    trial in *Walker* in any event because it's just at the

4    beginning stages.

5             Secondly, Judge Chhabria is not familiar with the

6    case.  When Mr. Post said he had mastered the facts, he's

7    wrong.  What's happened in that case was that AT&T, Inc. had

8    filed a motion to dismiss as to it for lack of jurisdiction.

9    Judge Chhabria had denied that motion and ordered discovery

10   on that issue.  He had also set an aggressive calendar, case

11   management procedure, but no discovery has ever been taken in

12   that case, not one deposition.  Some written discovery has

13   been taken but not one deposition has been taken.  And of

14   course as Mr. Post correctly said, no collective has been

15   certified in that case.  So that is years away from trial as

16   well.

17            Let me turn to the core proceeding business.  I am a

18   bankruptcy lawyer and endorse what Mr. Warfield said about

19   this being a court proceeding.  28 U.S.C. Section

20   157(b)(2)(A) provides the court proceedings include, quote,

21   allowance or disallowance of claims against the estate.  The

22   only carve-out for that are claims for personal injury or

23   wrongful death, which isn't the case here.

24            Let me talk about the Supreme Court decision in

25   *Stern v. Marshall,* which was cited in the reply brief filed a

1   short time ago by the plaintiffs.  *Stern v. Marshall* and

2   *Executive Benefits Insurance v. Arkinson,* its two progeny,

3   all dealt with claims by the estate against third parties,

4   not their claims against the estate.  The same is true for

5   the *Granfinanciera* and *Langenkamp* Supreme Court cases where

6   the question was, are you entitled to a jury trial when you

7   are sued by the estate?

8           Once as Mr. Warfield pointed out you're seeking to

9   collect from the estate, you're within the equitable power of

10  the jurisdiction of the bankruptcy court.  And as he said,

11  lots of people with jury trial rights have jurisdictions in

12  bankruptcy court and as these plaintiffs have as well.

13          It hasn't been mentioned so we will do so, that the

14  burden of proof here is on the plaintiffs.  And one of the

15  elements of the mandatory withdrawal, which Mr. Post talked

16  about, of course, was this business about a conflict between

17  bankruptcy law and some other non-federal law.  Today for the

18  first time we heard about this dispute about remedies.  I

19  don't see how you could be sitting here listening, Your

20  Honor, for the first time to references to the Code of

21  Federal Regulations, cited no cases, and say that the

22  plaintiffs who have had two years to work on this motion have

23  carried the burden of proof to show that there is a

24  substantial difference between the courts interpreting the

25  FLSA.

1      The very case that plaintiffs cited in their reply

2    brief for the first time and never before was this *Vicars*

3    *Ins. Agency* case out of the Seventh Circuit.  And the Seventh

4    Circuit said among other things, "Given the discretion

5    granted to district courts by Section 157(d) there is little

6    reason to assume that withdrawals required by the mere

7    presence of a non-title 11 issue, even if that issue is

8    outcome determinative.  This reading, which makes withdrawal

9    virtually automatic, reads out of the statute both the

10   district court and any 'consideration' whatsoever."

11     The fact is that a mere citing of a second federal

12   statute beyond the bankruptcy code isn't enough.  As Mr. Post

13   said, it has to be substantial and material.  And the burden

14   of proof is to show that it is, and plaintiffs have utterly

15   failed unless you consider that for the first time from the

16   podium citing a dispute and citing some provisions of the

17   Code of Federal Regulations carries that burden of proof, and

18   we submit that it does not.

19     I want to address permissive withdrawal because

20   Mr. Post didn't as well, so I'll leave it at that.  Let me

21   just take a look at my note real quickly.  I think that's

22   probably all I have to say in addition to what Mr. Warfield

23   said, but give me just one moment.

24     THE COURT:  Sure.

25     MR. LEVINSON:  I'll just in a moment echo briefly

1    what Mr. Warfield said about estimation.  The estimation

2    statute, which is Bankruptcy Code Section 502(c)(1), says

3    that estimation is mandatory, mandatory in the case of

4    unliquidated continuing claims when the resolution would

5    delay the administration of the estate.  There is no

6    carve-out for FLSA claims, of course, nor for anything else

7    other than in Title 28, the reference that Mr. Warfield gave

8    to personal injury and wrongful death claims, which is a

9    federal statute that would trump 502(c)(1).

10          So the bankruptcy judge will decide that issue on

11   February 7th.  It will be fully briefed.  Here you're just

12   hearing bits and snatches from the argument about estimation,

13   but as Mr. Warfield said, this estimation in common in

14   bankruptcy cases, is a valuable tool in moving bankruptcy

15   cases along as opposed to what could happen here if you

16   withdraw the reference, Judge Surratt-States grants relief

17   from the automatic stay, and we tumble into a year or two of

18   litigation and then have to come back to the bankruptcy and

19   deal with the AT&T indemnification claim and the claim

20   against the former shareholders.

21          So with that, Your Honor, I'll let Mr. Post respond.

22          MR. POST:  Very briefly, Your Honor.  Thank you.

23   The Court's been very patient and courteous with its time so

24   I want to be very focused on the legal question that's before

25   the Court, which is mandatory withdrawal of the reference.  I

1    won't comment further on the merits of the plan or the

2    bankruptcy proceedings.

3         The argument that you heard principally, though,

4    from the trustee is that the trustee has a comprehensive and

5    efficient solution to the case, and that economically it's

6    going to be the best way to resolve what is otherwise a

7    difficult problem.  At its bottom that is exactly the

8    argument that the Supreme Court rejected in *Stern v.*

9    *Marshall.*  The particular issue that arose in *Stern* that gave

10   rise to a right to an Article III court was different than

11   the nature of our claim.  But the ultimate question was is it

12   a sufficient answer to say we can ignore the constitutional

13   limits on bankruptcy court jurisdiction because it would be

14   efficient to move forward with a comprehensive bankruptcy

15   solution?  And the Supreme Court definitively said no.  An

16   estimation proceeding is a quasi administrative proceeding on

17   an accelerated timetable in a front of a non-Article III

18   judge is in no way a constitutional substitute for an Article

19   III trial in front of a jury for which we have a Seventh

20   Amendment right.

21        The argument was made that there is not a right to a

22   jury trial in this situation.  I submit there is no authority

23   that will support that proposition.  Obviously the Seventh

24   Amendment right to a jury trial is much broader than the

25   particular statute in bankruptcy that carves out specific

1    proceedings for which juries are mandatory.  Any proceeding

2    for which a litigant has a jury right under the Seventh

3    Amendment precludes adjudication by a bankruptcy court.  I

4    think that proposition is well settled.  I wouldn't expect

5    that it would be subject to controversy.

6            So the estimation procedure that is put forward is

7    not an answer to a jurisdictional defect.  The question is

8    not whether estimation is a good or a bad procedure, it's

9    whether it is congruent with what Article III requires and

10   the Seventh Amendment requires.  And although counsel praised

11   estimation proceedings and suggests that they are used

12   widely, they have not cited any case in which an estimation

13   proceeding has been used to estimate and ultimately confirm

14   the value of a traditional damages claim for which

15   adjudication is reserved to the Article III courts and a

16   Seventh Amendment right to a jury trial.  The only

17   illustration you were given was environmental cases.  Well,

18   environmental cases arise under a distinct federal statute

19   with a regulatory scheme that has a different history for

20   which the right to jury trial is quite different.  There is

21   no authority that would support what they are proposing to do

22   here.

23           Both counsel suggest that somehow this is a core

24   proceeding and not a non-core proceeding, and that is an

25   important distinction in understanding the force of the right

1    to a jury trial.  This is not a core proceeding based on

2    allowance of a claim.  This is a non-core proceeding, an

3    adversary proceeding against the debtor.

4          The test, and I'm reading, Your Honor, from

5    *Securities Farms v. International Brotherhood of Teamsters,*

6    which is 124 F.3d 997, it's a Ninth Circuit decision, the

7    test is, "Actions that do not depend on bankruptcy laws for

8    their existence and that could proceed in another court are

9    considered 'non-core.'"  That is the very essence of this

10   case.  It was proceeding in another court.  This is a classic

11   non-core proceeding.  And so the Ninth Circuit went on to

12   say, cases that did not depend on Title 11 but were in

13   federal court only because of their potential impact on the

14   administration of the estate are non-core, and because they

15   are non-core, the right to de novo review of any decision in

16   this court as an Article III court and right to a jury trial

17   dictates withdrawal of the reference.

18         Now, counsel for the trustee alluded to the *Wittes*

19   decision about mandatory withdrawal.  I want to actually read

20   from *Wittes* two key passages.  What happened in *Wittes* is

21   that the court there said there is no substantial and

22   material question of federal law that needs to be decided,

23   therefore, there is not a basis for mandatory withdrawal.

24   But the test is exactly the test I gave you.  The district

25   court must make an affirmative determination that resolution

1    of the claims will require substantial and material

2    consideration of non-code statutes.  That's exactly the

3    situation we have here.  Withdrawal is mandated only where

4    the issues presented require significant interpretation of

5    federal law.  As we've argued, these claims will require such

6    significant interpretation.

7            And I note in Footnote 2 of *Wittes,* the district

8    court makes a point of saying there may have been a right to

9    a jury trial in this case but there was not a jury demand.

10   In our case we have demanded and steadfastly asserted our

11   right to a jury trial.

12           I don't think that there is any principle

13   disagreement that there is a substantial material dispute

14   between these parties about these difficult questions of FLSA

15   liability.  The suggestion has been made that this is the

16   first that the defendants have heard of it.  I will tell the

17   Court we furnished legal memoranda to the defendants in

18   advance of the filing of the liquidation plan that set forth

19   our position on these issues.  It was apparent at the

20   mediation that these were the issues that were dividing the

21   parties.  So this is no surprise to anyone on the defense

22   side of the case.  This is the very heart of the litigation

23   at this point.

24           And I heard counsel for AT&T say that that issue

25   hadn't been developed in the original briefing, little

1    surprise because that briefing has been on file for two

2    years.  But you didn't hear him deny that there is a dispute.

3    And you didn't hear the trustee deny that there is a dispute,

4    because there is very serious dispute about these questions

5    of federal law that remain unresolved.

6              The final point that I'll make is the practical one,

7    that the trustee suggested even if you withdraw the

8    reference, the stay will prevent any forward momentum in the

9    cases.  I don't think that that is a credible suggestion.

10   The notion that the bankruptcy court would leave a stay in

11   place after an Article III court withdraws the reference and

12   preclude the parties from getting to a resolution on the

13   value of the claims assumes that the bankruptcy court would

14   actually choose to seek to obstruct a resolution of the case

15   in a constitutionally appropriate way.  That's not going to

16   happen.  If you withdraw the reference, the bankruptcy will

17   grant relief from the stay.  We will then adjudicate these

18   claims in a proper way, and then we can have a proper and

19   hopefully consensual plan that can be confirmed.

20             Your Honor, if you have no questions, we appreciate

21   your time.

22             THE COURT:  Thank you very much.  I'm fine, Counsel.

23   All right.  Today is the 16th.  Show the matter under

24   submission.  And, Counsel, between now and ten days from

25   today, which would be the 26th, you'll get my ruling, okay.

1    Probably sooner than later.  Yeah, sooner than later.  Okay.

2    All right.  We'll be in recess.

3              MR. LEVINSON:  Thank you, Your Honor.

4              THE COURT:  Thank you, Mr. Levinson.  Thank you,

5    Ms. Totten.

6              MS. TOTTEN:  Thank you, Your Honor.

7              (Court in recess at 12:21 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2          I, Susan R. Moran, Registered Merit Reporter, in

3    and for the United States District Court for the Eastern

4    District of Missouri, do hereby certify that I was present

5    at and reported in machine shorthand the proceedings in the

6    above-mentioned court; and that the foregoing transcript is

7    a true, correct, and complete transcript of my stenographic

8    notes.

9          I further certify that I am not attorney for, nor

10   employed by, nor related to any of the parties or attorneys

11   in this action, nor financially interested in the action.

12         I further certify that this transcript contains

13   pages 1 - 48 and that this reporter takes no responsibility

14   for missing or damaged pages of this transcript when same

15   transcript is copied by any party other than this reporter.

16         IN WITNESS WHEREOF, I have hereunto set my hand

17   at St. Louis, Missouri, this 5th day of February, 2019.

18

19                       _____

20                       /s/ Susan R. Moran
                         Registered Merit Reporter

21

22

23

24

25